304 A.2d 47.

ALICE TIRELLA ROMANO *vs.* DORIS DUKE.

MAY 4, 1973.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J. On October 7, 1966 at approximately 4:00 p.m. Edward Tirella, age 42, died almost instantly as the result of injuries sustained when an automobile operated by the defendant struck him as he was attempting to unlock the gates at the entrance to the defendant's Newport estate. The deceased and the defendant were leaving the estate to meet the President of the Newport Preservation Society and discuss a project envisioning the restoration of the many early colonial homes that abound in the Newport area.

Thereafter, the deceased's sister brought this civil action seeking damages for herself, her brothers and her sisters pursuant to G. L. 1956 (1969 Reenactment), ch. 7 of title 10, better known as "Death By Wrongful Act."[1]

An extended jury trial was held in the Superior Court. The jury reported a verdict for plaintiff in the amount of $75,000. Interest, which was added to the jury's verdict, amounted to $21,000. The plaintiff's motion for a new trial was denied. Since defendant concedes that there is evidence of her negligence, the sole issue before us is the adequacy of the jury's award and the correctness of the denial of the motion for a new trial.

During its January, 1971 session, the General Assembly amended the wrongful death statute by the addition of a specific formula which was to be used by the trier of fact in determining damages. The formula, which is found in P. L. 1971, ch. 46, sec. 1, now G. L. 1956 (1969 Reenactment) §10-7-1.1, was used at the trial.[2] It reads as follows:

"1. Determine the gross amount of the decedent's prospective income or earnings over the remainder of his life expectancy, including therein all estimated income he would probably have earned by his own exertions, both physical nad mental.

"2. Deduct therefrom the estimated personal expenses that the decedent would probably have incurred for himself, exclusive of any of his dependents, over the course of his life expectancy.

"3. Reduce the remainder thus ascertained to its present value as of the date of the award. In determining said award, evidence shall be admissible con-

[1]Section 10-7-3 provides that if no action has been initiated by the executor or administrator within six months after death, the action may be brought by any of the estate's beneficiaries.

[2]The 1971 amendment contains provisions which permit its use in civil actions pending at the time of its passage. It also emphasizes that the jury's award is not to be considered as an asset of the deceased's estate nor is it to be used to pay the deceased's debts.

cerning economic trends, including but not limited to projected purchasing power of money, inflation and projected increase or decrease in the costs of living."

The main thrust of plaintiff's appeal is her contention that when the Legislature directs that a deceased's "personal expenses" be deducted from his anticipated gross earnings, it means his "living expenses" and not his "business expenses." The trial justice thought otherwise. He was correct.

Recently, in *Wiesel* v. *Cicerone,* 106 R. I. 595, 261 A.2d 889 (1970), we reiterated our "well-established" rule for ascertaining damages receivable under our wrongful death statute. Damages, we said, are determined by (1) ascertaining the gross amount of the decedent's prospective income or earnings, (2) deducting what the decedent would have had to expend as a producer, computed according to his status in his life, his means and his personal habits to acquire such income or earnings, and (3) reducing the result to its present value. This rule was first promulgated in *McCabe* v. *Narragansett Electric Lighting Co.,* 26 R. I. 427, 59 A. 112 (1904) and repeated several times since then. Admittedly, our wrongful death statute up until 1971 did not speak of a deceased's "personal expenses." In fact, it did not contain any rule for measuring damages. The rule had been fashioned in the courts rather than the General Assembly. However, in *McCabe,* the court first declared that the deceased's "personal expenses" were to be deducted from his income or earnings and then the court went on to hold that a deduction must be made of "* * * what the deceased would have to lay out as a producer to render the service or to acquire the money that he might be ex-

pected to produce * * *.["3]  Since the days of *McCabe*, this court has treated a decedent's "personal expenses" as including the expenses he would have to incur to generate his estimated future earnings or income.  We presume that the Legislature is familiar with the construction we have given the phrase "personal expenses" in suits brought under the earlier versions of our wrongful death statute. *Podborski* v. *William H. Haskell Mfg. Co.*, 109 R. I. 1, 279 A.2d 914 (1971).

The plaintiff's argument that the 1971 amendment allows a deduction only for a deceased's "living expenses" is not only lacking in logic but also completely overlooks the event that precipitated the General Assembly's action.

To adopt the distinction pressed by plaintiff would result in a discrimination that was never intended by the Legislature.  As defense counsel so aptly points out, if plaintiff's narrow view of the new statute were adopted, the heirs of an unsuccessful self-employed businessman who had gross receipts of $30,000 a year, annual business expenses of $31,000 and who borrowed $5,000 to pay his living expenses, would show net earnings of $25,000.  On the other hand, the heirs of a wage earner who worked in a factory for an annual salary of $8,500 and had no expenses except living expenses of $3,500 would show a comparative paltry net income of $5,000.  Statutes are not to be construed to bring about an unreasonable result.  *Coletta* v. *State*, 106 R. I. 764, 263 A.2d 681 (1970).  The Legislature in its use of the term "personal expenses" never intended that the self-employed would enjoy the preferen-

---

[3]In *Underwood* v. *Old Colony Street Ry.*, 33 R. I. 319, 80 A. 390 (1911), approval was given to an instruction that the jury should deduct from the income realized from the deceased's labor the interest on his business capital and the fair rental value of that portion of his property that was devoted to farming.  Later, in *Sebille* v. *Dunn*, 99 A. 831 (R. I. 1917), the court approved the deduction of the operational expense of a farm in computing the deceased's net earnings.

tial treatment afforded them by the position taken by plaintiff.

The real purpose of the restructuring of the wrongful death statute can be seen by an analysis of *Williams* v. *United States,* 435 F.2d 804 (1st Cir. 1970). This was a wrongful death case heard by a justice of the United States District Court for the District of Rhode Island. The deceased was a nine-year old boy. His father was a noncommissioned officer in the Navy. The trial judge found that the boy had an earning expectancy[4] of 39 years. He found that the deceased's gross earnings and the expenses which would be deducted to reach the net recovery would be the same as his father's naval pay less certain expenses which are covered by various allowances paid naval personnel. An adjustment was also made for future inflationary trends. In vacating a judgment of some $131,000 the Court of Appeals faulted the trial court for not deducting from the deceased's future income the cost of supporting the dependents that a male adult is reasonably expected to have. The appellate court also described the increasing of anticipated future earnings by the use of a multiple representing future inflation an "inadmissible speculation."

Section 1 of the 1971 amendment is the General Assembly's answer to this phase of the *Williams* case. There, the legislators made it clear that any probable expenditures made for the support of the deceased's dependents are to be disregarded and that, in finalizing an award, evidence concerning the future trend of the earnings, be it inflationary or deflationary, may be considered. Before any such award can be finalized, evidence must be produced as to *all* of the expenses the deceased would have had to incur to produce the estimated amount of his future earnings.

[4]Life expectancy is not the equivalent of work expectancy. *Gonyer* v. *Russell,* 160 F. Supp. 537 (D. R. I. 1958).

The trial justice's ruling allowing evidence of Tirella's business expenses was proper.

In considering the trial justice's denial of plaintiff's motion for a new trial, it is necessary to give a brief resume of the evidence.

Edward Tirella, also known as Eduardo Tirella, at the time of his death was a bachelor. He had worked at one time or another as a Hollywood extra, an interior decorator, a landscape architect, and a designer of women's hats and movie sets. Although he could not gain membership in the motion picture crafts union, he hobnobbed with many luminaries of filmdom and cafe society including Mae West, Elizabeth Taylor, Richard Burton, Claudia Cardinale, David Niven, Jacqueline Kennedy and defendant Doris Duke, heiress and reportedly one of the world's wealthiest women. The deceased had done some decorating work at Miss Duke's estates which are located in Rhode Island, New Jersey, California and Hawaii. He assisted in the floral design of the Duke Gardens. The gardens, a tourist attraction, are located in a portion of defendant's New Jersey estate. They consist of a series of greenhouses and represent the various garden styles found throughout the world. This work had been "dwindling down" and "becoming less" in the last years of his life.

In 1952, he was set designer for a play, for which he was paid $400 to $500 a week. This job lasted two or three years. At one time, he was associated with a real estate developer as color coordinator and the designer of home layouts. The jury was told that at one time the Burtons spoke to the deceased about the possibility of his designing a home for them in Mexico. Testimony was introduced describing the deceased variously as a "great genius in many fields of artistry," "a connoisseur of antiques," "*very talented*," "a famous hat designer," and "Michelangelo."

Tirella owned a small car. He maintained two apart-

ments in California, one in Los Angeles, the other near the shore resort, Big Sur. When he was not being wined and dined by Hollywood stars, he generally stayed at home and ate his own cooking. He never had enough money to keep a secretary. He made no profit with his interior decorating efforts. Single all his life, he contributed not a penny to the support of his mother or the other members of his family. He spent whatever he had. His friends were constantly lending him money. An attorney friend told the jury that *if* someone wanted "Eddie" to work for him, the deceased could have "easily" set his own price. Another witness, an employee of Metro-Goldwyn-Mayer, testified that salaries paid skilled technicians such as Tirella "would go way up" because movie producers would want to make use of such skills. However, there was no firm evidence that the deceased was going to work on another picture around the time of the fatal mishap. One witness pictured Tirella as a "lousy businessman."

Data concerning Tirella's gross earnings and expenses for the last six years of his life was produced by plaintiff. It was based upon federal tax returns, canceled checks and merchandise receipts. These documents in no way gave a complete listing of Tirella's income and expenses.

The plaintiff's counsel posed a series of hypothetical questions to an actuary as to what Tirella's discounted net income would be under varying assumptions as to gross income, expenses given a future work expectancy of 30 years and a discount rate of four per cent. The hypothetical gross earning figures ranged from $35,880 to $104,-000, the expenses ranged from $3,588 to $20,800. Based upon those assumptions, the actuary gave various estimates of the net loss to Tirella's estate ranging from $495,-000 to $1,697,000.

The defense then had the actuary base his computations on the actual, though incomplete, earnings and expense

figures of 1963, 1964, 1965 and 1966. The discount rate was four per cent and the work expectancy figure was 30 years. The witness arrived at a figure of $9,800 net loss to the estate. When he used a higher discount figure of six and one-half per cent, the net loss to the estate was $7,495. The defendant justified the use of the higher discount rate by pointing out that the prevailing interest rate on triple A bonds ranged from seven to eight per cent.

In his charge, the trial justice told the jury that it might consider what the decedent was actually earning at the time of his death, the length of time he worked for those who might have employed him in the future, the prospect of his retaining a job, his opportunity for other employment, and that it might look more to the future than the past in ascertaining damages. The jury was given a choice as to what reasonable discount rate it might apply.

The plaintiff's motion for a new trial was based on the alleged inadequacy of the jury's award. The trial justice rejected plaintiff's projections and observed that there was substantial evidence to support the verdict.

On the record before us, we find that the decision of the trial justice affirming the verdict neither misconceived nor misconstrued any material evidence. Both he and the jury were called upon to perform a most difficult function. Based on the evidence presented to them, they took over the joint role of soothsayer and mathematical analyst in order to foretell what the future held for the deceased. The plaintiff claimed that, in a manner of speaking, everything in her brother's future would come up roses. The defendant portrayed Tirella as one who would continue to be an artistic success but a financial fiasco. The ultimate award in a wrongful death action is based upon a series of predictions none of which involve absolute certainty. Damages in such circumstances are truly incapable of precise proof.

In the case at bar, the plaintiff was given full reign. The jury was shown slides of Tirella's work at defendant's New Jersey estate and a 45 minute movie depicting the deceased's artistic efforts, including his bit-parts as an actor in three Hollywood productions. The defendant told the jury about her four cars. She could not remember whether she had a Cadillac, but admitted ownership of a Rolls Royce. In other words, there was no doubt that the jury was well aware that there were adequate resources to satisfy a substantial judgment. It had been given a choice as to the present value of Tirella's future net estate. As was its right, it made its own choice.

The award appears to be a reasonable response to the evidence. The trial justice has refused to disturb it. The plaintiff has failed to convince us that the trial justice erred.

The plaintiff's appeal is denied and dismissed.

Mr. Justice Powers participated in the decision but retired prior to its announcement. Mr. Justice Doris did not participate.

*Edward I. Friedman,* for plaintiff.

*Keenan, Rice, Dolan & Reardon, John T. Keenan, Aram A. Arabian,* for defendant.